UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

CAROLYN RICHARDSON,

                        Plaintiff,

v.

UNITED STATES OF AMERICA, ANTHONY
BUSSANICH, M.D., ROBERT BEAUDOUIN, M.D.,
JAMES WEYAND, O.D., SAM GEORGY,
WARDEN MCC, and JOHN/JANE DOES Nos. 1-10,

                        Defendants.

-------------------------------------------------------------------x

**COMPLAINT
AND JURY DEMAND**

**Civil Action No.:** 1:19-cv-1892

**ECF Case**

Plaintiff, CAROLYN RICHARDSON (at times referred to as "Ms. Richardson"), by and through her undersigned counsel, respectfully alleges and tenders the following as her Complaint and Jury Demand against UNITED STATES OF AMERICA, ANTHONY BUSSANICH, M.D., ROBERT BEAUDOUIN, M.D., JAMES WEYAND, O.D., SAM GEORGY, WARDEN MCC, and JOHN/JANE DOES Nos. 1-10 (collectively referred to as "Defendants").

## PRELIMINARY STATEMENT

1.     Plaintiff brings this suit pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971) and its progeny, under the Fifth and Eighth Amendments to the United States Constitution, for the willful failure and withholding of proper medical care and treatment, and access to proper medical care and treatment, which caused her to suffer cruel and unusual treatment while she remained a prisoner and in the custody of the United States Bureau of Prisons ("BOP"). Plaintiff further brings this suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq., for negligence and/or professional malpractice in connection with the care and treatment provided to her by individual Defendants within the scope of their employment with the United States Bureau of Prisons.

1

2.     As a direct result of Defendants' wrongful acts and omissions, Plaintiff CAROLYN RICHARDSON suffered permanent and catastrophic injuries for which she now seeks relief.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over the subject matter of this Complaint under the United States Constitution and 28 U.S.C. §§ 1331 and 1346 (b).

4.     This Court has personal jurisdiction over the Defendants because the alleged incidents occurred within the confines of this Court.

5.     Venue is proper within the United States District Court for the Southern District of New York under 28 U.S.C. §§ 1391 and 1402 (b) in that a substantial part of the events giving rise to the claim occurred within the boundaries of the Southern District of New York.

## CONDITIONS PRECEDENT TO THIS LAWSUIT

6.     Pursuant to the FTCA, on or about January 18, 2018, Plaintiff timely served an Administrative Claim, providing the BOP with the necessary information to investigate Plaintiff's claims and their worth.

7.     In a letter dated August 30, 2018, the BOP denied Plaintiff's claims in their entirety. The same letter was received by Plaintiff on September 5, 2018.

8.     Plaintiff therefore exhausted administrative remedies with respect to her claims, and met all conditions precedent to this lawsuit.

9.     This action is timely pursuant to 28 U.S.C. § 2401(b) in that it is begun within six months of the federal agency's letter denying the Administrative Claim.

## PARTIES

10.     At all times herein mentioned, continuing to the present time, Plaintiff remained a prisoner in the custody of the United States BOP, incarcerated in an administrative housing facility

located at 150 Park Row, New York, NY 10007, commonly known as the Metropolitan Correctional Center– New York ("MCC").

11.    Defendant UNITED STATES OF AMERICA is the appropriate defendant for Plaintiff' claims under the Federal Tort Claims Act.

12.    At all times herein mentioned, defendants ANTHONY BUSSANICH, M.D., ROBERT BEAUDOUIN, M.D., and JAMES WEYAND, O.D. (collectively at times referred to as "Medical Defendants") were medical personnel employed by the BOP and/or MCC, and were responsible for the day-to-day oversight of medical examination, testing, treatment and general health of inmates confined at MCC.

13.    With respect to Plaintiff's <u>Bivens</u> claims herein, defendant ANTHONY BUSSANICH, M.D. (hereinafter "BUSSANICH") is sued in his individual capacity.

14.    At all times herein mentioned, defendant BUSSANICH was or represented himself to be a physician duly licensed or authorized to practice medicine in the State of New York.

15.    At all times hereinafter mentioned, defendant BUSSANICH was or represented to the public in general, and to the Plaintiff in particular, to be able, competent and qualified to skillfully diagnose, care for, and treat patients in general, and the Plaintiff in particular, in accordance with good and accepted standards of medical care and practice.

16.    At all times hereinafter mentioned, defendant BUSSANICH undertook to and did provide medical, diagnostic and technical examinations, evaluations, consultations, care, treatments, procedures, services, or advise of, for and to Plaintiff.

17.    With respect to Plaintiff's <u>Bivens</u> claims herein, defendant ROBERT BEAUDOUIN, M.D. (hereinafter "BEAUDOUIN") is sued in his individual capacity.

18.     At all times herein mentioned, defendant BEAUDOUIN, was or represented himself to be a physician duly licensed or authorized to practice medicine in the State of New York.

19.     At all times hereinafter mentioned, defendant BEAUDOUIN was or represented to the public in general, and to the Plaintiff in particular, to be able, competent and qualified to skillfully diagnose, care for, and treat patients in general, and the Plaintiff in particular, in accordance with good and accepted standards of medical care and practice.

20.     At all times hereinafter mentioned, defendant BEAUDOUIN undertook to and did provide medical, diagnostic and technical examinations, evaluations, consultations, care, treatments, procedures, services, or advise of, for and to Plaintiff.

21.     With respect to Plaintiff's Bivens claims herein, defendant JAMES WEYAND, O.D. (hereinafter "WEYAND") is sued in his individual capacity.

22.     At all times herein mentioned, defendant WEYAND was or represented himself to be an optometrist duly licensed or authorized to practice optometry in the State of New York.

23.     At all times hereinafter mentioned, defendant WEYAND was or represented to the public in general, and to the Plaintiff in particular, to be able, competent and qualified to skillfully diagnose, care for, and treat patients in general, and the Plaintiff in particular, in accordance with good and accepted standards of medical care and practice.

24.     At all times hereinafter mentioned, defendant WEYAND undertook to and did provide medical, diagnostic and technical examinations, evaluations, consultations, care, treatments, procedures, services, or advise of, for and to Plaintiff.

25.     At all times herein mentioned, defendants SAM GEORGY, "WARDEN MCC," and "JOHN/JANE DOES Nos. 1-10" (collectively at times referred to as "Administrative

4

Defendants") were personnel employed by the BOP and/or MCC, and worked within the MCC in different capacities including, but not limited to, Wardens, Correctional Officers, administrative staff, and healthcare professionals. At all times herein mentioned, these defendants were responsible, in whole or in part, for the day-to-day operation and conditions of MCC, and for the health and safety of inmates confined within.

26.     With respect to Plaintiff's <u>Bivens</u> claims herein, defendants SAM GEORGY (hereinafter "GEORGY"), "WARDEN MCC," and "JOHN/JANE DOES Nos. 1-10" are sued in their individual capacities.

27.     At all times herein mentioned, defendant GEORGY was the Health Services Administrator at MCC, who was in charge of the custody and care provided to Plaintiff. Specifically, he was responsible for ensuring that inmates with requisite medical needs are scheduled for, and taken to, medical visits to external providers.

28.     Defendants "WARDEN MCC," and "JOHN/JANE DOES Nos. 1-10" are the fictitious names of persons still to be learned at MCC, who were in charge of the custody and care provided to Plaintiff, including but not limited to her medical visits to external providers.

### STATEMENT OF FACTS

29.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs "1" through "28" of this complaint with the same force and effect as though fully set forth herein.

### MS. RICHARDSON'S 2016 ARREST AND PRIOR HISTORY

30.     In August 2015, Ms. Richardson, then 40 years of age, had cosmetic iris implants inserted in her bilateral eyes while in Lebanon.

31. On or around July 20, 2016, Ms. Richardson was arrested and held as a pre-trial detainee at MCC.

32. Ms. Richardson was released on bail on August 1, 2016, but returned to MCC on August 5, 2016, with the diagnosis of "pink eye" infection on the left eye from an external medical center.

33. Upon information and belief, Ms. Richardson was housed at the MCC – New York at all times relevant herein, after August 5, 2016.

## MS. RICHARDSON'S MEDICAL HISTORY IN BOP CUSTODY

34. Upon her return to the MCC on August 5, 2016, Ms. Richardson was scheduled for an optometry consultation through the Healthcare Services within MCC, commonly known as Chronic Care Clinic ("CCC").

35. On or around August 18, 2016, Ms. Richardson was first seen in CCC by defendant WEYAND, an optometrist, and/or defendant BUSSANICH, then Clinical Director of MCC, for complaints that included clouded vision, sensations of grittiness, and decreased visual acuity of bilateral eyes. Based upon their examination of Ms. Richardson, defendants confirmed that she was suffering from glaucoma, which required immediate evaluation, testing, close monitoring, and treatment. In fact, the diagnosis of "Unspecified glaucoma" was included in Ms. Richardson's BOP "Health Problems" list beginning on July 28, 2016.

36. Upon information and belief, the clear potential source of Ms. Richardson's glaucoma was the iris implants, blocking the drainage angle in the eye and causing a particular type of glaucoma known as closed-angle glaucoma.

37. American Optometric Association reports that closed-angle glaucoma is by definition a "medical emergency that can cause blindness within a day of its onset." Furthermore,

6

closed-angle glaucoma is an "emergency condition in which severe blindness can occur quickly ... [b]ut if it is diagnosed and treated early, it can usually be controlled." Even though "vision already lost to glaucoma cannot be restored [...], [m]edication or surgery can slow or prevent further blindness."

38.     From August 18, 2016 onward, Ms. Richardson experienced recurrent and worsening symptoms of closed-angle glaucoma, including, but not limited to, pain and discomfort and reduced visual acuity, particularly in her left eye. She continued putting in sick call's and was examined by health care professionals within MCC, including defendants BUSSANICH, BEAUDOUIN, WEYAND, and others whose identities are not currently known and for purposes of this Complaint are referred to as "JOHN/JANE DOES No. 1-10." In addition, her examination results and medical condition were reported to defendants BUSSANICH and/or BEAUDOUIN as medical directors of MCC.

39.     On or around August 24 and August 26, 2016, Ms. Richardson was seen in CCC by defendant WEYAND and BUSSANICH for eye examination and vision screening. Given Ms. Richardson's medical history and complaints, defendants WEYAND and BUSSANICH knew, or should have known, that she was at a heightened risk to develop closed-angle glaucoma as a result of elevated intra-ocular pressure secondary to the iris implants – a condition associated with irreversible blindness if left unmonitored or untreated. Therefore, defendants knew that she had to be immediately referred to a glaucoma specialist, in order to consider surgical removal of her iris implants and to properly evaluate and treat her condition.

40.     Yet, defendants did not refer Ms. Richardson to an ophthalmologist, and sent her back to her jail cell after each examination. Upon information and belief, defendants WEYAND and BUSSANICH are not ophthalmologists.

41.     On or around September 2, 2016, Ms. Richardson returned to CCC for complaints including further decreased vision in her left eye. At this point, defendants BUSSANICH and WEYAND prescribed Ms. Richardson anti-intra-ocular-pressure and anti-glaucoma medications, showing their actual knowledge of her condition. Notwithstanding their knowledge of the urgency and gravity of her medical complaints, defendants still denied her pleas for proper treatment and refused to send her to an ophthalmologist.

42.     Throughout September and early October of 2016, Ms. Richardson continued informing defendants of worsening vision, pain, and discomfort in her left eye that, significantly, were not being resolved with the prescribed medications. She also suspected that her iris implants may be the source of her condition, and pleaded to be seen by an ophthalmologist to consider removing the implants.

43.     Ms. Richardson was seen for a "sick call" within MCC on September 3, 9, 22, and 30, 2016, and again by defendant BUSSANICH on October 7, 2016, but was not referred to an ophthalmologist. She was instead prescribed artificial tear to treat the infection.

44.     During these visits, her intra-ocular pressure was not even documented in the medical record. Defendants knew and deliberately disregarded a significant risk in failing to closely monitor intra-ocular pressure of a patient with Ms. Richardson's history.

45.     By September 2, 2016 at the latest, Defendants knew or should have known that Ms. Richardson was at a substantial risk of closed-angle glaucoma, likely as a result of her iris implants' causing elevated intra-ocular pressure. Defendants were aware of the urgency and seriousness of Ms. Richardson's medical condition that was not being resolved with medications she was receiving. They also knew that uncontrolled closed-angle glaucoma can cause permanent and irreversible blindness, extreme pain, degeneration, and significant loss of quality of life.

## MS. RICHARDSON'S FIRST APPOINTMENT AT KINGSBROOK

46.     On October 20, 2016, after more than two months of recurrent complaints to Medical Defendants, Ms. Richardson was finally taken to Kingsbrook Jewish Medical Center ("Kingsbrook"), where she was seen by a glaucoma specialist Reshma Mehendale, M.D., "for evaluation of left eye glaucoma […] and left eye pain and light sensitivity." She was diagnosed with moderate stage "chronic angle-closure glaucoma" in left eye that was "likely secondary to iris implants," "Unspecified iridocyclitis," and "Unspecified adhesions of iris" in left eye.

47.     In a report that was shared with Defendants, Dr. Mehendale specifically noted that Ms. Richardson's "inflammation and IOP [intra-ocular pressure] should be well controlled before considering explanting implants," prescribed medications for the purpose of controlling IOP, and ordered that she return to Kingsbrook for a follow-up in <u>one week</u>.

48.     "Clinical Encounter – Administrative Note" created by defendant BUSSANICH at 2:16pm on October 21, 2016, recites Dr. Mehendale's recommendations <u>verbatim</u>, establishing his actual knowledge of Kingsbrook's findings and orders.

49.     Nevertheless, defendant BUSSANICH did not order a return visit to Kingsbrook, or any ophthalmologist, without explanation. In fact, it was <u>three months</u> later on January 24, 2017, that Ms. Richardson was finally allowed to see an ophthalmologist again.

50.     Between October 28, 2016, and January 24, 2017, Ms. Richardson repeatedly complained about her rapidly deteriorating eye condition, requested medical services at the CCC <u>every week</u>, and pleaded for another visit to an ophthalmologist. By December 2, 2016, Ms. Richardson was complaining that she could barely make out shapes and features with her left eye.

51.     Even though defendant BUSSANICH and/or defendant WEYAND saw Ms. Richardson in CCC at least twice in December 2016, they merely recommended her to continue

taking her prescribed medications and ignored the urgency and significance of her complaints. These defendants, as a medical doctor and an optometrist, knew that closed-angle glaucoma will lead to permanent and irreversible blindness unless promptly treated.

52.     For example, in the BOP Health Services "Clinical Encounter" note dated December 22, 2016, defendant WEYAND noted that Ms. Richardson's left eye vision was 20/100 and that she "MUST KEEP TAKING DROPS FOR OS [left eye] CHRONIC […] EYE STILL ACTIVE EYE STILL ANGRY KEEPS OUTSIDE CYCLISTIC OS APPOINTMENTS WITH EYE SURGEON." Instead of referring her to an ophthalmologist, defendant WEYAND discharged her with plan to "Follow-up in 1 Month," which is so far outside of the standard of care for Ms. Richardson's medical emergency that the defendant could not have been making a truly medical judgment. This note was completed by defendant WEYAND and cosigned by defendant BUSSANICH.

53.     In all of the "Clinical Encounter" notes kept by Defendants leading up to January 24, 2017, there is no documentation of Ms. Richardson's intra-ocular pressure. There is no evidence that her IOP was even being monitored, even though Defendants knew that this indifference can cause irreversible blindness that was preventable with timely intervention.

54.     Between October 28, 2016, and January 24, 2017, Ms. Richardson continued seeing defendant BUSSANICH and/or defendant WEYAND in CCC every week. Upon information, throughout this time period, defendant BUSSANICH evidenced his deliberate indifference to Ms. Richardson's serious medical needs by accusing her of exaggerating and over-reacting to her eye pain, and mocking her for the iris implants she had received. He told her on one occasion, to wit, "I bet you wish you didn't put those implants in." This comment captures the cruel and callous treatment that Ms. Richardson was subjected to, despite her debilitating medical condition; it also

10

shows defendant BUSSANICH's actual knowledge that the iris implants were the source of her injuries. Yet, it was only on January 24, 2017, full <u>three months</u> after her initial ophthalmology appointment, that Ms. Richardson was taken back to Kingsbrook's ophthalmologist for the removal of iris implant – the same ophthalmologist who had ordered a return visit in <u>one week</u>.

55.     Upon information and belief, during relevant times, defendant GEORGY was the Health Services Administrator at MCC, who was in charge of ordering and arranging Ms. Richardson's medical visits to external providers. His deliberate indifference to Ms. Richardson's serious medical needs is evidenced by a comment he allegedly made to Ms. Richardson: "We didn't tell you to put those things in your eyes," referring to her iris implants, shifting the blame onto her and demeaning her legitimate and urgent medical needs.

### MS. RICHARDSON'S SECOND APPOINTMENT AT KINGSBROOK

56.     On January 24, 2017, Ms. Richardson finally returned to Kingsbrook to see a glaucoma specialist and was scheduled for an emergent removal of the left iris implant. By this point, her visual acuity in left eye was <u>20/400</u>. The physician noted "limited view of angle structures secondary to obscuration by iris implants within the anterior chamber angle," "[inability] to dilate pupils due to presence of artificial iris implants," and "[l]imited view [left eye] sec[ondary] to corneal edema."

57.     Kingsbrook's physician questioned why Ms. Richardson missed the follow-up appointment from October 2016, and why Ms. Richardson had remained on a medication that should not have been used for so long without proper monitoring. Specifically, "Treatment" section of Kingsbrook's Progress Note dated January 24, 2017, reads (emphasis added):

> Chronic angle-closure glaucoma, left eye, moderate stage [...]: PATIENT MUST COME
> BACK MONDAY 1/30/16 FOR EVALUATION!!!! PATIENT CANNOT MISS THIS
> APPOINTMENT!!! [...] **Patient has been on Prednisolone gtts QID OS [left eye] since**

**OCTOBER because she was never brought back for her eye appointment – UNACCEPTABLE!!!** Patient now has elevated pressure OD [right eye] as well, no pain, no edema. [...] **patient now needs to be taking glaucoma meds for both eyes due to elevated pressures OU! IMPLANTS MUST COME OUT and patient MUST RETURN TO SEE GLAUCOMA SPECIALIST DR. MEHENDALE 1/30/2017 – SHE CANNOT MISS THIS APPOINTMENT**.

58.    Defendant BEAUDOIUN signed at the bottom of said Progress Note, wrote "Reviewed," and dated the signature for "01/24/17," establishing his actual knowledge that Defendants had let Ms. Richardson wait for an excessively long period of time before getting proper medical treatment that they knew she needed, and that this deliberate indifference exacerbated her injuries and caused unnecessary and wanton infliction of pain and suffering.

## MS. RICHARDSON'S SUBSEQUENT MEDICAL HISTORY

59.    On February 23, 2017, Ms. Richardson's left eye iris implant was surgically removed. Record from Ms. Richardson's follow-up visit to Kingsbrook on March 20, 2017, documents persisting "elevated pressures OU [bilateral eyes] (OS [left eye] > OD [right eye]), better controlled since starting medications, but still elevated OS. Likely that patient suffered from uveitic glaucoma and angle damage by previous iris implant."

60.    On April 24, 2017, Kingsbrook further documented ongoing issues as follows:

IOP continues to be elevated OU (on maximal PO and topical meds). [...] Also has corneal edema and decompensation with poor retinal view [...] Discussed with patient the need[ ] for further pressure lowering surgical intervention. Pt verbally acknowledges understanding, will schedule for Ahmed implant OS. ... pt was previously scheduled for for [sic] glaucoma surgery but had to be rescheduled. Pt now likely nee[d]s combined forms of surgery including cornea, retina and glaucoma.

61.    In May 2017, given Ms. Richardson's serious condition that requires combined forms of surgery, her care was transferred from Kingsbrook to New York Eye and Ear Infirmary ("NYEEI").

62.     On May 26, 2017, NYEEI physician informed Ms. Richardson that her intra-ocular pressure on left eye was 48, and on right eye was 49. Upon information and belief, an appropriate intra-ocular pressure for patients with Ms. Richardson's history is between 12 and 15. The next day, she received an urgent surgery on left eye, where a glaucoma implant (also known as aqueous shunt or glaucoma drainage device) was inserted to relieve the pressure.

63.     On June 1, 2017, Ms. Richardson's right iris implant was also removed and replaced with a glaucoma implant. From this point onward, she had multiple surgical and post-surgical follow-up's at NYEEI, at least some of which were delayed or had to be rescheduled because of MCC's recurrent problems in arranging medical visits.

64.     For example, BOP Health Services "Clinical Encounter" dated July 5, 2017, notes that Ms. Richardson was seen that day at NYEEI, and was "GIVEN RECOMMENDATION FOR FOLLOW-UP ON JULY 19TH 2017." However, according to BOP records on July 19, 2017, Ms. Richardson returned "from her medical trip but was not seen by the ophthalmologist due to late arrival for the scheduled appointment."

65.     BOP Health Services record dated August 23, 2017, by James Weyand OD noted:

SEE NYEE CONSULT DATED 6/30/2017 MUST KEEP FOLLOW UP VISITS!!! […] INMATE IS ON DIAMOX, DUE TO SIDE EFFECTS MEDICALLY NEEDS 2 PILLOWS AND SHOULD SLEEP ON HER LEFT SIDE AT NIGHT. NEEDS A NEW PAIR OF BIFOCAL GLASSES WITH A DARK TINT. NEEDS A HAND HELD MAGNIFIER TO READ WITH. […] MUST KEEP ON TIME OUTSIDE F/U WITH NYEE

66.     On or around September 5, 2017, a physician at NYEEI noted persisting "high IOPs OU despite max[imum] med[ication]s and DMX [Diamox] for many months," as well as "significant [corneal] edema OU," and recommended keratoplasty of left eye and pilocarpine for right eye. Ms. Richardson's right eye vision was 20/25, but left eye could only see "Hand movement." The BOP Health Services "Clinical Encounter" note that day is signed by defendant

BEAUDOUIN, establishing his knowledge that Ms. Richardson was due for a "PRE-OP VISIT WITH DR RICHARD KAPLAN IN 1-2 WEEKS."

67.     Nevertheless, BOP records from September 29, 2017, show that Ms. Richardson "returned from her schedule[d] pre-op DSAEK-OS appointment at NYEEI." Ms. Richardson reported that "[t]he appointment did not take place, that "[she] stayed in the car, [and] they told [her] [she] did not have an appointment." Upon information and belief, the pre-operative consult was postponed by two months, to November 24, 2017 as a result.

68.     Despite multiple surgical interventions including a recent surgery on or around December 12, 2018, Ms. Richardson has only experienced small improvements to her condition. To date, she complains of chronic closed-angle glaucoma, irreversible blindness in left eye, blurry vision and severe photophobia in bilateral eyes, permanently dilated bilateral pupils, permanent iris atrophy in bilateral eyes, permanent nerve damage in bilateral eyes, excruciating pain and suffering, mental distress, fear, anxiety, and discomfort. Even though Ms. Richardson was tried and sentenced in August 2017, she remains incarcerated at MCC because of the medical hold in connection with her eye condition.

69.     As a direct result of Defendants' acts and omissions, Plaintiff suffered severe and permanent injuries as outlined above.

70.     Specifically, during relevant times, Medical Defendants knew of and disregarded an excessive risk to Ms. Richardson's health, by failing to take adequate steps to provide her with proper medical care, treatment, and services, including but not limited to immediate referral to a glaucoma specialist, despite their knowledge that Ms. Richardson had developed closed-angle glaucoma, a medical emergency that is well known to cause permanent irreversible blindness unless promptly controlled and treated. These defendants' acts and omissions in failing to provide

treatment for, and access to treatment for, Plaintiff's serious medical condition were so far below acceptable standards of care, that they could not have been making truly medical judgments.

71.     In addition, during relevant times, Administrative Defendants knew of and disregarded an excessive risk to Ms. Richardson's health, by failing to take reasonable measures to provide her with access to proper medical attention including but not limited to visits to an ophthalmologist, even though they were informed by Medical Defendants and/or Ms. Richardson herself that she was suffering from a medical emergency known to cause permanent irreversible blindness, and that their intervention could prevent the unnecessary and wanton infliction of prolonged pain and suffering.

72.     Upon information and belief, during all times mentioned in this complaint, the Defendants were acting in their individual and official capacity, under color of law, to wit, under color of constitution, statute, ordinance, laws, rules, regulations, policies, customs and usages of the United States.

## AS AND FOR A FIRST CAUSE OF ACTION

### Plaintiff v. Defendants BUSSANICH, BEAUDOUIN, WEYAND, SAM GEORGY, WARDEN MCC, and JOHN/JANE DOES Nos. 1-10 in their individual capacities

### Bivens Claim – Eighth Amendment – Cruel and Unusual Punishment

73.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs "1" through "72" of this complaint with the same force and effect as though fully set forth herein.

74.     Defendants' conduct deprived Plaintiff of her rights protected under the Eighth Amendment to the United States Constitution, in that they failed to provide Plaintiff with adequate medical care although they knew or should have known that doing so posed an excessive risk to her health.

75.     Defendants' deliberate indifference to Plaintiff's serious medical needs constitutes cruel and unusual punishment, and the unnecessary and wanton infliction of pain that the Eighth Amendment prohibits under Estelle v. Gamble, 429 U.S. 97 (1976) and its progeny.

76.     Defendants have deprived Plaintiff of such rights under color of law and are liable to Plaintiff pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971) and its progeny.

77.     Beginning on August 18, 2016, and particularly between September 2, 2016 and January 24, 2017, Defendants knew or should have known that Ms. Richardson was afflicted with closed-angle glaucoma as a result of elevated intra-ocular pressure from iris implants – a medical emergency associated with rapid and permanent blindness unless promptly controlled and treated.

78.     Ms. Richardson's closed-angle glaucoma was objectively serious in that it was a condition of urgency that was observable, one that caused Ms. Richardson extreme pain, degeneration, and significant loss of quality of life.

79.     As set forth more fully above, including in the Statement of Facts, between September 2, 2016 and January 24, 2017, defendants BUSSANICH and WEYAND knew that Ms. Richardson had developed closed-angle glaucoma, and that unmonitored closed-angle glaucoma is a debilitating medical emergency that can lead to irreversible blindness even in a short span of time. Hence, they knew that she needed to be seen by an ophthalmologist to consider an emergent removal of iris implants, in order to prevent a substantial risk of irreversible blindness.

80.     Defendants were deliberately indifferent to Ms. Richardson's serious medical needs, in that they failed to take reasonable measures to provide Ms. Richardson with proper medical treatment, or access to proper medical attention, for several months, even though they

knew that they had an opportunity to intervene and prevent the exacerbation of Plaintiff's injuries and damages.

81.     In fact, comments made by individual Defendants evidence that they were mocking Ms. Richardson, accusing her of exaggerating and over-reacting to her eye pain, and insinuating that she only had herself to blame. As set forth more fully in the Statement of Facts, between October 2016 and January 2017 when she was presenting to CCC every week to complain about her vision loss and plead for an ophthalmology appointment, Ms. Richardson was allegedly told by defendant BUSSANICH who was the medical director of MCC at the time: "I bet you wish you didn't put those implants in." Defendant BUSSANICH also accused Ms. Richardson of overreacting to the pain that she was experiencing. In addition, defendant GEORGY who was in charge of scheduling the external medical visits allegedly mocked Ms. Richardson saying, "We didn't tell you to put those things in your eyes."

82.     Despite their knowledge that she was facing a substantial risk of debilitating permanent injury, Defendants had Ms. Richardson wait for an excessively long period of time before receiving proper medical treatment. As set forth more fully above, Ms. Richardson did not see an ophthalmologist until October 20, 2016, and once she was seen, was not taken to a follow-up appointment that was scheduled for a week later, even though Defendants were aware of its importance. In fact, Ms. Richardson did not see an ophthalmologist again until January 24, 2017.

83.     As seen above, between September 2, 2016 and January 24, 2017, and prior and subsequent thereto, Ms. Richardson repeatedly informed Defendants of the urgency of her medical needs in visibly obvious ways, and pleaded to be taken to an ophthalmologist.

84. As seen above, between September 2, 2016 and January 24, 2017, and prior and subsequent thereto, defendants GEORGY, WARDEN MCC, and JOHN/JANE DOES Nos. 1-10 failed to take steps to schedule, arrange, or allow necessary medical visits to occur.

85. Between September 2, 2016 and January 24, 2017, defendants BUSSANICH, BEAUDOUIN, and WEYAND failed to ensure that BOP employees in the MCC who interacted with Ms. Richardson knew that she had a debilitating medical emergency and required close and timely medical attention, monitoring, and follow up.

86. The acts and omissions of Defendants described more fully above were outside of the scope of "medical or related functions" as defined in 42 U.S.C. § 233(a). The acts and omissions of Defendants BUSSANICH, BEAUDOUIN, and WEYAND described more fully above, in failing to provide treatment for, or access to treatment for, Plaintiff's serious medical condition were so far below acceptable standards of care, that Defendants could not have been making truly medical judgments.

87. Defendants were deliberately indifferent to Ms. Richardson's serious medical needs, and as a result of their action or lack thereof, Plaintiff's rights under the Eighth Amendment were violated, causing Plaintiff permanent injury and unnecessary, prolonged pain.

88. Such actions of the defendants caused to subject the Plaintiff in the custody or under the physical control of the United States Government to cruel, inhuman, or degrading treatment or punishment prohibited by the Eighth Amendment to the Constitution of the United States and constitute a blatant violation of Plaintiff's civil rights secured by laws of the United States.

89. As a direct, legal and proximate result of the foregoing, including the aforesaid negligent acts and omissions and medical malpractice of the defendants, Plaintiff suffered injuries and damages including but not limited to unmonitored closed-angle glaucoma, irreversible

blindness in left eye, blurry vision and severe photophobia in bilateral eyes, permanently dilated bilateral pupils, permanent iris atrophy in bilateral eyes, permanent nerve damage in bilateral eyes, need for multiple surgeries including aqueous shunt insertion in bilateral eyes, excruciating pain and suffering, mental distress, fear, anxiety, and discomfort, frustration and loss of quality of life, loss of enjoyment and pleasures of life, as well as attendant losses, including, but not limited to, past and future medical expenses.

## AS AND FOR A SECOND CAUSE OF ACTION

### Plaintiff v. Defendants BUSSANICH, BEAUDOUIN, WEYAND, SAM GEORGY, WARDEN MCC, and JOHN/JANE DOES Nos. 1-10 in their individual capacities

#### Bivens Claim – Fifth Amendment – Substantive Due Process

90.　　Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs "1" through "89" of this complaint with the same force and effect as though fully set forth herein.

91.　　Defendants' conduct deprived Plaintiff of her substantive due process rights protected under the Fifth Amendment to the United States Constitution, in that they failed to provide Plaintiff with adequate medical care although they knew or should have known that doing so posed an excessive risk to her health.

92.　　Defendants have deprived Plaintiff of such rights under color of law and are liable to Plaintiff pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971) and its progeny.

93.　　Beginning on August 18, 2016, and particularly between September 2, 2016 and January 24, 2017, Defendants knew or should have known that Ms. Richardson was afflicted with closed-angle glaucoma as a result of elevated intra-ocular pressure from iris implants – a medical emergency associated with rapid and permanent blindness unless promptly controlled and treated.

19

94. Ms. Richardson's closed-angle glaucoma was objectively serious in that it was a condition of urgency that was observable, one that caused Ms. Richardson extreme pain, degeneration, and significant loss of quality of life.

95. As set forth more fully above, including in the Statement of Facts, between September 2, 2016 and January 24, 2017, defendants BUSSANICH and WEYAND knew that Ms. Richardson had developed closed-angle glaucoma, and that unmonitored closed-angle glaucoma is a debilitating medical emergency that can lead to irreversible blindness even in a short span of time. Hence, they knew that she needed to be seen by an ophthalmologist to consider an emergent removal of iris implants, in order to prevent a substantial risk of irreversible blindness.

96. Defendants failed to take reasonable measures to provide Ms. Richardson with proper medical treatment, or access to proper medical attention, for several months, even though they knew that they had an opportunity to intervene and prevent the exacerbation of Plaintiff's injuries and damages.

97. Despite their knowledge that she was facing a substantial risk of debilitating permanent injury, Defendants had Ms. Richardson wait for an excessively long period of time before receiving proper medical treatment. As set forth more fully above, Ms. Richardson did not see an ophthalmologist until October 20, 2016, and once she was seen, was not taken to a follow-up appointment that was scheduled for a week later, even though Defendants were aware of its importance. In fact, Ms. Richardson did not see an ophthalmologist again until January 24, 2017.

98. As seen above, between September 2, 2016 and January 24, 2017, and prior and subsequent thereto, Ms. Richardson repeatedly informed Defendants of the urgency of her medical needs in visibly obvious ways, and pleaded to be taken to an ophthalmologist.

99.     As seen above, between September 2, 2016 and January 24, 2017, and prior and subsequent thereto, defendants GEORGY, WARDEN MCC, and JOHN/JANE DOES Nos. 1-10 failed to take steps to schedule, arrange, or allow necessary medical visits to occur.

100.     Between September 2, 2016 and January 24, 2017, defendants BUSSANICH, BEAUDOUIN, and WEYAND failed to ensure that BOP employees in the MCC who interacted with Ms. Richardson knew that she had a debilitating medical emergency and required close and timely medical attention, monitoring, and follow up.

101.     The acts and omissions of Defendants described more fully above were outside of the scope of "medical or related functions" as defined in 42 U.S.C. § 233(a). The acts and omissions of Defendants BUSSANICH, BEAUDOUIN, and WEYAND described more fully above, in failing to provide treatment for, or access to treatment for, Plaintiff's serious medical condition were so far below acceptable standards of care, that Defendants could not have been making truly medical judgments.

102.     Defendants failed to provide Plaintiff with adequate medical care although they knew or should have known that doing so posed an excessive risk to her health, and as a result of their action or lack thereof, Plaintiff's substantive due process rights protected under the Fifth Amendment to the United States Constitution were violated.

103.     As a direct, legal and proximate result of the foregoing, including the aforesaid negligent acts and omissions and medical malpractice of the defendants, Plaintiff suffered injuries and damages including but not limited to unmonitored closed-angle glaucoma, irreversible blindness in left eye, blurry vision and severe photophobia in bilateral eyes, permanently dilated bilateral pupils, permanent iris atrophy in bilateral eyes, permanent nerve damage in bilateral eyes, need for multiple surgeries including aqueous shunt insertion in bilateral eyes, excruciating pain

and suffering, mental distress, fear, anxiety, and discomfort, frustration and loss of quality of life, loss of enjoyment and pleasures of life, as well as attendant losses, including, but not limited to, past and future medical expenses.

## AS AND FOR A THIRD CAUSE OF ACTION

### Plaintiff v. Defendant UNITED STATES OF AMERICA

### Federal Tort Claims Act- Medical Malpractice

104.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs "1" through "103" of this complaint with the same force and effect as though fully set forth herein.

105.    Commencing on or about July 20, 2016, and at all times herein mentioned, Defendants, individually or through their agents, servants, and/or employees undertook and endeavored to, and did advise and treat Ms. Richardson professionally as a healthcare provider or physician, including providing diagnosis, care, and treatment for her diagnosed and well-documented history of closed-angle glaucoma and other medical conditions.

106.    At all times complained of herein, Medical Defendants represented themselves to be skilled, competent and careful physicians, optometrists, and healthcare providers with the knowledge and capacity to practice medicine in accordance with the standards common and acceptable in the community.

107.    As set forth herein, the Medical Defendants' treatment of Ms. Richardson fell below acceptable standards and skills.

108.    Defendants thus breached the duty they owed to Ms. Richardson.

109.    Defendants did not possess the necessary skill to treat Ms. Richardson.

110.    Defendants neglected to apply the skill they did have.

111.    Defendants did not use reasonable care in applying the skill they had.

112.    Defendants mistreated Ms. Richardson and engaged in medical practice which fell below the customary and acceptable standards.

113.    Beginning on or around August 18, 2016 – the day of Ms. Richardson's first optometry consultation provided by MCC and CCC – BOP's medical personnel knew of Ms. Richardson's history of iris implants and glaucoma, and that she required close monitoring of intra-ocular pressure.

114.    Once Medical Defendants noted the elevation in Ms. Richardson's intra-ocular pressure on September 2, 2016, they knew, or should have known, that she was at a heightened risk to develop closed-angle glaucoma – a medical emergency associated with irreversible blindness. Therefore, the standard of care was to immediately refer Ms. Richardson to a glaucoma specialist to consider surgical removal of the iris implants and to properly evaluate and control her closed-angle glaucoma.

115.    Upon information and belief, defendants WEYAND and BUSSANICH are not ophthalmologists. Between September 2, 2016, and January 24, 2017, they examined Ms. Richardson on a weekly basis for worsening eye pain and visual acuity, but never referred her to an ophthalmologist.

116.    By September 2, 2016 at the latest, Defendants knew that Ms. Richardson had closed-angle glaucoma and elevated intra-ocular pressure that was likely caused by iris implants. Closed-angle glaucoma is a condition that can lead to irreversible blindness unless properly controlled and treated without delay.

117.    Between September 2, 2016, and January 24, 2017, and prior and subsequent thereto, Defendants BUSSANICH and WEYAND were aware of Ms. Richardson's progressive

23

loss of vision, and the need to surgically remove her iris implants that were likely causing the elevation of intra-ocular pressure.

118.    Between September 2, 2016, and January 24, 2017, and prior and subsequent thereto, Defendants BUSSANICH and WEYAND were negligent and departed from the standard of care in failing to promptly refer Plaintiff to a glaucoma specialist or any other ophthalmologist, and failing to properly monitor, control, or treat Plaintiff's intra-ocular pressure.

119.    On October 20, 2016, Ms. Richardson first saw an ophthalmologist at Kingsbrook, who recommended close monitoring and medical management of her intra-ocular pressure prior to surgically removing her iris implants. The ophthalmologist recommended a return to Kingsbrook in 1 week for a follow-up, which was received by defendant BUSSANICH.

120.    Defendants BUSSANICH and WEYAND were negligent and departed from the standard of care in failing to ensure that this recommendation was adhered to, or that Ms. Richardson was otherwise provided proper and timely treatment for her medical condition.

121.    Ms. Richardson was not taken to an ophthalmologist again until January 24, 2017. Kingsbrook's record from January 24, 2017, explicitly notes that such delay in monitoring and continued use of steroid-based medication were so far outside of the standard of care that it was considered "**UNACCEPTABLE!!!**"

122.    Defendants BUSSANICH and WEYAND were negligent and departed from the standard of care in failing to inform the unit officer(s) or any other BOP officers of Ms. Richardson's need to have access to an ophthalmologist in a timely manner as her condition was expected to worsen, absent the removal of iris implants.

123.     Defendants BUSSANICH and WEYAND were negligent and departed from the standard of care when they saw Ms. Richardson on December 22, 2016, and merely recommended that she continue taking her prescribed medication and follow up in 1 month.

124.     By the time Ms. Richardson returned to Kingsbrook on January 24, 2017, Ms. Richardson's vision deficits were permanent, irreversible, and severe.

125.     From January 24, 2017 onward, Ms. Richardson needed to receive multiple surgeries and follow-up treatments at Kingsbrook and NYEEI, including the removal of bilateral iris implants and placement of glaucoma implants to mechanically relieve the intra-ocular pressure.

126.     Defendants were further negligent and departed from the standard of care in failing comply with the follow-up appointments at NYEEI.

127.     As one example, on September 29, 2017, despite defendant BEAUDOUIN's documented knowledge that Ms. Richardson was scheduled for a pre-operative consultation at NYEEI, the appointment was not properly scheduled, delaying the said consultation to November 24, 2017.

128.     Defendant BEAUDOUIN was negligent and departed from the standard of care in failing to inform the unit officer(s) or any other BOP officers of Ms. Richardson's need to have access to an ophthalmologist in a timely manner.

129.     At all the times herein mentioned, it was the duty of reasonable care of "Medical Defendants" to provide proper and adequate medical treatment and care to the Plaintiff within a reasonable time, and not to suffer and permit excessive punishment to her.

130.     As set forth herein, the defendants' diagnosis, care, and treatment of Ms. Richardson fell below acceptable standards and skills, and defendants breached the duty which they owed to Ms. Richardson.

131. The Defendants and/or their employees, agents and/or servants, acting within the scope of his office or employment, breached their duty to the plaintiff by failing to provide proper and adequate medical treatment and care to the Plaintiff and her urgent and serious medical needs within a reasonable time despite numerous requests and despite the obvious risks of permanent worsening of Plaintiff's conditions, and failing to implement urgent and necessary treatments including prompt referral to an ophthalmologist, which, upon information and belief, would have otherwise been recommended.

132. Defendants were negligent and departed from the standard of care in other ways that are documented in the medical records and in ways of which Plaintiff are not yet aware.

133. As a direct, legal and proximate result of the foregoing, including the aforesaid negligent acts and omissions and medical malpractice of the defendants, Plaintiff suffered injuries and damages including but not limited to unmonitored closed-angle glaucoma, irreversible blindness in left eye, blurry vision and severe photophobia in bilateral eyes, permanently dilated bilateral pupils, permanent iris atrophy in bilateral eyes, permanent nerve damage in bilateral eyes, need for multiple surgeries including aqueous shunt insertion in bilateral eyes, excruciating pain and suffering, mental distress, fear, anxiety, and discomfort, frustration and loss of quality of life, loss of enjoyment and pleasures of life, as well as attendant losses, including, but not limited to, past and future medical expenses.

134. Ms. Richardson's injuries were inflicted solely through the negligence of the defendants, and through no fault or want of care of negligence or contributory negligence on the part of Ms. Richardson.

135. Defendants' conduct was grossly negligent in that defendants were so careless as to show complete disregard for the rights and safety of Ms. Richardson.

136. Defendants engaged in willful misconduct in that defendants acted in such a reckless manner as to completely disregard the consequences of their actions.

137. Defendants' acts and omissions constitute the tort of medical malpractice under the laws of the State of New York.

138. Under the Federal Tort Claims Act, defendant United States of America is liable for the individual Defendants' acts and omissions within the scope of their employment.

## AS AND FOR A FOURTH CAUSE OF ACTION

### Plaintiff v. Defendant UNITED STATES OF AMERICA

### Federal Tort Claims Act- Negligence

139. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs "1" through "138" of this complaint with the same force and effect as though fully set forth herein.

140. Commencing on or about July 20, 2016, and at all times herein mentioned, Plaintiff remained a prisoner and in the custody of the BOP and was housed at MCC.

141. At all the times herein mentioned, the defendant, and/or its agents, servants, and employees operated maintained, managed, and controlled MCC.

142. As set forth more fully above, including in the Statement of Facts, Defendants owed Plaintiff duties to provide proper medical care, and failed to comply with those duties.

143. At all the times herein mentioned, it was the duty of the defendant, BOP, its agents, servants and/or employees to operate, maintain, and manage the said premises, protecting the health and safety of the inmates within.

144. At all the times herein mentioned, it was the duty of the defendant, BOP, its agents, servants and/or employees to ensure that inmates with requisite medical need are scheduled for, and taken to, appointments with external medical providers for proper care and treatment.

145. The defendants, their agents, servants, and/or employees breached their duty to Plaintiff by failing to schedule or comply with the scheduled appointments at the external medical facilities, and by improperly allowing and permitting Plaintiff's intra-ocular pressure to remain elevated, despite her recurrent complaints, sick calls, and visits to the CCC.

146. As a direct, legal and proximate result of the foregoing, including the aforesaid negligent acts and omissions and medical malpractice of the defendants, Plaintiff suffered injuries and damages including but not limited to unmonitored closed-angle glaucoma, irreversible blindness in left eye, blurry vision and severe photophobia in bilateral eyes, permanently dilated bilateral pupils, permanent iris atrophy in bilateral eyes, permanent nerve damage in bilateral eyes, need for multiple surgeries including aqueous shunt insertion in bilateral eyes, excruciating pain and suffering, mental distress, fear, anxiety, and discomfort, frustration and loss of quality of life, loss of enjoyment and pleasures of life, as well as attendant losses, including, but not limited to, past and future medical expenses.

147. Ms. Richardson's injuries were inflicted through no fault of her own but were solely and wholly by reason of Defendants' failure to provide, or take steps to provide, proper care and treatment including timely referral to and treatment by an ophthalmologist, the need for which they had prior knowledge of through information provided to Defendants by Ms. Richardson and external medical providers.

148. Defendants' conduct was grossly negligent in that defendants were so careless as to show complete disregard for the rights and safety of Ms. Richardson.

149. Defendants engaged in willful misconduct in that defendants acted in such a reckless manner as to completely disregard the consequences of their actions.

150. By reason of the foregoing, the above described actions of the Defendants constitute negligent under the laws of the State of New York.

151. Under the Federal Tort Claims Act, defendant United States of America is liable for the individual Defendants' acts and omissions within the scope of their employment.

## AS AND FOR A FIFTH CAUSE OF ACTION

## Plaintiff v. Defendant UNITED STATES OF AMERICA

## Federal Tort Claims Act- Negligent Supervision, Hiring, and Retention

152. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs "1" through "151" of this complaint with the same force and effect as though fully set forth herein.

153. The aforementioned acts and omissions against Plaintiff were a direct result of the negligence, carelessness, and recklessness of defendant UNITED STATES OF AMERICA in failing to meet its duty of care to Plaintiff in its screening, hiring, training, supervising, evaluating, and retaining of individual Defendants.

154. As a direct, legal and proximate result of the foregoing, including the aforesaid negligent acts and omissions and medical malpractice of the defendants, Plaintiff suffered injuries and damages including but not limited to unmonitored closed-angle glaucoma, irreversible blindness in left eye, blurry vision and severe photophobia in bilateral eyes, permanently dilated bilateral pupils, permanent iris atrophy in bilateral eyes, permanent nerve damage in bilateral eyes, need for multiple surgeries including aqueous shunt insertion in bilateral eyes, excruciating pain and suffering, mental distress, fear, anxiety, and discomfort, frustration and loss of quality of life,

loss of enjoyment and pleasures of life, as well as attendant losses, including, but not limited to, past and future medical expenses.

155.    Defendant UNITED STATES OF AMERICA's acts and omissions constitute the tort of negligent supervision, retention, and hiring under the laws of the State of New York.

156.    Under the Federal Tort Claims Act, defendant UNITED STATES OF AMERICA is liable for these actions.

## JURY DEMAND

157.    Plaintiff demands a trial by jury in this action as to her <u>Bivens</u> claims.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff pray that this Honorable Court enter judgment against the Defendants and request:

1.  An award of general and special damages in an amount to be determined at trial, plus prejudgment interest as permitted by law, for any and all monetary and/or non-monetary losses suffered by Plaintiff;

2.  An award of punitive damages as to individual Defendants in an amount to be determined at trial;

3.  All other relief sought by Plaintiff under this Complaint;

4.  An award of costs that Plaintiff have incurred in his action, including, but not limited to, Plaintiff' reasonable attorneys' fees and costs to the fullest extent permitted by law; and

5.  Such other and further relief as the Court deems just and proper.

Dated: February 28, 2019
New York, New York

RESPECTFULLY SUBMITTED,

By: Alan L. Fuchsberg, Esq.
The Jacob D. Fuchsberg Law Firm, LLP
*Attorneys for Plaintiff*
3 Park Avenue, Suite 3700
New York, New York 10016
P: (212) 869-3500
F: (212) 398-1532
a.fuchsberg@fuchsberg.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
CAROLYN RICHARDSON,

**CERTIFICATE OF MERIT**

Plaintiff,

**Civil Action No.:** 1:19-cv-1892

v.

UNITED STATES OF AMERICA, ANTHONY
BUSSANICH, M.D., ROBERT BEAUDOUIN, M.D.,
JAMES WEYAND, O.D., SAM GEORGY,
WARDEN MCC, and JOHN/JANE DOES Nos. 1-10,

Defendants.
--------------------------------------------------------------------x

ALAN L. FUCHSBERG, the undersigned, an attorney admitted to practice in the Courts of

New York State, states that he is a partner at The Jacob D. Fuchsberg Law Firm, LLP, attorneys for

the plaintiffs in the within action. I have reviewed the facts of this case and have consulted with at

least one physician who is licensed to practice in this State or any other state and who I reasonably

believe is knowledgeable in the relevant issues involved in this action, and I have concluded on the

basis of such review and consultation that there is a reasonable basis for the commencement of this

action.

Dated: February 28, 2019
New York, New York

RESPECTFULLY SUBMITTED,

By: Alan L. Fuchsberg, Esq.
The Jacob D. Fuchsberg Law Firm, LLP
*Attorneys for Plaintiff*
3 Park Avenue, Suite 3700
New York, New York 10016
P: (212) 869-3500
F: (212) 398-1532
a.fuchsberg@fuchsberg.com